17-14-14 and 17-26-22-2662. Mr. Hoppeck. Good morning. May it please the Court. I'm Matthew Hoppeck on behalf of Lidia Ramirez. There are basically three issues I wanted to talk about today. All of them come down to fairness. I think this is an appeal about fairness, but it's also an appeal about administrative law. You've heard a lot of administrative law today. Thank you for your patience. Here comes some more. There's a real question in the first paragraph of the Board's decision here about what it meant when it said it was deferring to the immigration judge. We know what deference means because we do this work. Deference is a doctrine that was created by the Supreme Court for courts in deciding how much leeway to give an agency in interpreting the statutes they've been tasked with interpreting. Courts defer to agencies because agencies are experts on the law that they have been tasked with interpreting. And there is a series of cases the Supreme Court has issued what kind of deference. If it's a regulatory issue, there's the Mead case. If it's a gap in the statute, it's the Chevron case. We found no case that says the Board, a component of the Department of Justice, should or can defer to the immigration judge. There's this alternative concept about adopting and affirming the immigration judge's decision. That is when the Board agrees with it, that it's so complete and accurate that there's no need to issue a new administrative decision. Well, now, Mr. Hoppe, be sure I'm following you. First thing I see, and I may be on the wrong order, that January 26, 2017 is review the finest faculty and credibility and likelihood events under a clearly erroneous standard. Am I looking at the right? Ramirez, January 26, 2017? That's correct. That's the statement of the law. Well, that doesn't say defer. Tell me what you're talking about in the defer. I'm talking about page 3 of the administrative record. Okay, page 3, but not the outset, but page 3. I'm sorry. No, I'm sorry. It's the first page of the Board's decision, the third page of the AR. It's the third paragraph in the decision, the first sentence. Okay, so after they, in the second paragraph, they get it right there. We agree. The statement of law, boilerplate correct. Correct. Okay. But then when they get into, so here's what we're going to do, they say, now we intend to defer to the immigration judge. Decision, whatever the word. What do you think they mean by decision? Do you think they're really saying that the immigration judge screwed up on some stuff, but even so, we're not going to throw it out? It's hard to say. Okay, well, it says first, you know what the rest of the paragraph says. Right. You're better on it than I am. So what do you think? Go ahead. The Department of Justice proposes in its briefing that the Board can adopt and affirm. That's one thing the Board can do. That's at page 18 of their briefing. I don't think that's what the Board did here because it issued a longer decision. Incidentally, on the waiver issue, the Department of Justice argues the Board did not adopt and affirm. They issued its own decision. It's hard to know what the Board intended to do. I would argue the regulations are quite clear. The Board is not allowed to defer to the immigration judge decision and instead must, the regulation I think says, use independent judgment and discretion. I hate to ask, but sure they defer on credibility, right? Does the Board defer to the judge on credibility calls? They don't, but they use a higher standard. They use clear error. Credibility is a fact finding. We know how to do fact finding. We review it for clear error. And any fact finding, you told me this in a brief once, any fact finding by the Board has been taken away by statute. They cannot find facts anymore. We often end up in this court arguing that the Board has done fact finding when it should have done clear error review. Correct. Okay, good. Proceed. Right. So there's the big question mark hanging over this case about what does the Board mean to defer? I don't think the Board has explained what it means. And the Board, if it meant defer, if it didn't mean adopt and affirm, if it really meant defer, that's unlawful. It's not allowed to do that. The second issue is the nature of the immigration judge's decision because the question is what are they deferring to? We go and read the immigration judge's decision, and it gives every indication that this judge had a prewritten cookie cutter decision. She steps out of the courtroom at the end of trial, changes the he to her and the him to she, and brings it back in and says this is my decision. The Board corrects some of that, saying there's Scrivener's errors, that she knew this was a female. She knew she was from Guatemala. But the Board doesn't correct all of it. And what stands out to me as the most important is the sentence in the immigration judge's decision about testimony she gave about her family being safe in Mexico. So toward the end of the immigration judge's decision, the judge says – What page are you on, if you know? Go ahead, if you don't. Proceed. I think it's at page 51 of the administrative record. Okay, have it in front of me. Go ahead. The immigration judge says respondent testified that her other family members have not been physically harmed or tortured since he left Mexico. The problem with this sentence is that testimony was never given because that question was never asked. You have a very truncated two to three question hearing. And so the question then is why is this in the decision? Well, I mean, okay, I think everybody will agree she used a form. I mean, I don't know the government even argues that. And it's clearly wrong. So what do we do, though, with the fact that the Board made a – It's kind of a cobbled decision. I agree with you there. At one point they say we're deferring, which sounds like they're adopting. But then they make a fairly independent analysis. So what do we – how do we deal with the Board's decision? Bigger picture, I think it's harder. On this specific thing, I think it's easier. Because in that paragraph, the third paragraph of the Board's decision, the Board doesn't address this sentence. It addresses you got the country wrong and the gender wrong. We think those are Scrivener's errors. But in that paragraph it doesn't talk about this other sentence about family being safe in Mexico. The Board didn't talk about that. It's not a Scrivener. Well, I guess depending on how you define a Scrivener's error. I mean, she obviously took a form, slapped it together, and failed to – And they say misstatements. The Board says misstatements. And sometimes this court has deferred to that. So in the Lopez Amador case that the Attorney General cites, that was a case where the judge had gotten it wrong, but then the Board on appeal had said we looked at the country reports for China. It was a Venezuelan case, and we don't think you're at risk. And this court said, look, the Board just missing the country, that's not enough to reverse. I don't think that's what happened here. But with respect to that single sentence, the one about phantom testimony about family members being safe in Mexico, the Board doesn't address it. It doesn't rely on it either, right? The Board does not quote or rely on the sentence, right? It doesn't rely on it. That's true. But the question, though, is if the immigration judge does the fact-finding and the Board reviews it for clear error, did the Board even review that sentence? Did the Board find the fact-finding the judge had found to be clear error? And that's not clear from this record because the Board didn't address that sentence. Now, the Board also says that, well, putting all that aside and assuming the decision is totally screwed up, you haven't really argued that she's entitled to asylum and that you have to make some argument that it makes a difference. So that gets to our third issue, which is that the hearing is so short, the judge doesn't ask. There are specific questions the judge needed to ask to make a decision on that. I don't think the judge has to spend a specific amount of time or ask exactly 11 questions and then you've met due process. But there are things in the asylum analysis that are not contained in the asylum form that you have to ask about. That's what the Board says in that matter-of-fee-fee case, and then this court talked about it in Al-Quri. One of them, for example, is can you relocate internally in your country? The form doesn't ask that question, the Form I-589. The immigration judge in her written decision says you didn't meet your burden of proof that you can't internally relocate, and the Board affirmed that. The problem is that question wasn't asked at trial, and the form and the papers don't talk about it. So how does a pro se indigent immigrant raise that issue and have a record that then we could say whether the Board is right or wrong, that the record as a whole supports the denial of asylum? Our argument in the briefing, and I'll wrap this point up, is that there's a due process issue here. The hearing isn't full enough to actually make those determinations. And, finally, the Supreme Court says in the Accardi v. Shaughnessy case that if the rules require a hearing and you didn't get a complete hearing, you get remand, even if you might lose on remand, because the record is so undeveloped that it would be hard to require anyone to prove that they would have won if they had had a full hearing. Thank you, Mr. Childs. Thank you. Thank you. Mr. Lorenz. May it please the Court, my name is Jesse Lorenz, and I represent the Attorney General of the United States. This Court should decline to disturb the Board's decision because Ms. Ramirez was afforded a fundamentally fair hearing by the immigration judge and the agency's denial of Ms. Ramirez's applications for relief and protection are supported by the record and applicable law. Okay, defend the IJ's hearing. Was it enough? Well, Your Honor, the government posits that it was enough. She allowed the, or she was, Ms. Ramirez was, her application was read back to her in Spanish. She stated that it was true and correct. She understood the interpreter when it was read back to her. Then she also stated that the statement she made before the asylum officer and the earlier credible fear determination were true and correct. Then the immigration judge asked her several pointed questions about that asylum application. How many or several? Do you ever count them? I believe it was seven to ten questions. Thank you. Did they ask about the one Mr. Hoppe complains about? There was no record. Relocation. Relocation, no. That was asked by the asylum officer, and the answer she gave to the asylum officer, but not the immigration judge. I want to make this clear. It was the asylum officer. I'm looking back to that. But she did say to the asylum officer that she wasn't able to relocate Guantanamo. Is it separate? Is it a separate part of the asylum form that they make notes on? Yeah. Well, I mean, the asylum officer, his hearing is just an initial screening mechanism, essentially. The immigration judge does a more fulsome review. But also, I would say there were, at the end of the hearing, the immigration judge's hearing, she asked her two open-ended questions. Asked her twice if there was anything else she'd wish to add, and she said no both times. And I think that's the crux of our prejudice argument, is that we still have no answer as to what additionally she would have raised. I mean, we're not conceding that this was a due process violation. We think that the hearing was full and fundamentally fair. But at bottom, there's just no prejudice here. We don't know what additionally she would have testified to, had no proffer of that the entire time. These are things she could have addressed to the board, but ultimately chose not to. And we still don't know. She still hasn't brought them up before this court what additionally she might have said. What's your best case on the most bare-bones IJ hearing circuit courts will approve? Well, I think our position is supported by both matter of FIFI and matter of FIFI. No, that's a board decision, right? It's a board decision, sure. I was asking for a court appeals case. Okay. Well, I think our position is supported by a quarry. There's also an unpublished case I had to cite. But that, I guess, gets to prejudice, the unpublished case I had to cite. But I think our quarry supports it. I mean, there was no denial of testimony. Now, that's the Supreme Court case? Which one are you referring to? The Al Quarry decision is an Eighth Circuit case. Okay, great. And I think that supports our position because there was no attempt by the immigration judge to curtail her testimony in any way. She asked her several pointed questions about it, about the testimony, because she was pro se. And then offered her two open-ended opportunities to present anything else she wished to add. And she didn't say anything else. And, I mean, even if we look back again to the asylum officer interview, the same thing was presented to her. She presented substantially the same story to the asylum officer. And, again, at the end was asked was there anything else she feared in Guatemala. And she said, no, it's just this neighbor and the thugs that he sent after me. So we're talking about a claim that's been pretty similar throughout the course of these proceedings. I mean, it was presented before an asylum officer. Again, in her asylum application, where she was represented by counsel. Counsel helped her prepare that asylum application. And then before the immigration judge. So, at this point, I feel like the record or the government posits that the record has been, she has been afforded a fundamentally fair opportunity to develop it. And, you know, I understand the concerns about the number of questions she was asked. Maybe the hearing could have been longer. But the claim, if you look at it at bottom, it's a very, very simple claim. She was being sexually harassed by her neighbor. She refused his advances. She later reported that he was attempting to rape a child or apparently a child. And then after she reported that rape, the police came to the scene. And then after that, the neighbor sent two men to threaten her for money and extorted her or attempted to extort her. That hasn't changed. When asked why he did this, she said that he was sexually attracted to her. So that's just not a basis for asylum. Sexual attraction is not one of the protected grounds. Well, it's really two-pronged. It's the brevity of the hearing and then it's all the errors in the decision. Well, I understand that. And that's the point of the Board of Immigration Appeals is to look at the record and to make – not reconsider, but to consider the records or the errors that were pointed out. And the board did that. The board discharged that duty. If you look at that – What do they mean by deferring to the ALJ? Well, I agree that that's not entirely clear. But I think if you look at the scope and the nature of the decision, we have defer as one sentence. And then after that, we have the board making a bunch of different decisions. I mean the board – Apology. The rest of the paragraph said apology. Well, the rest of that paragraph is an apology. But then after that, they say we uphold the denial of asylum because she didn't show past harm rising to the level of persecution. And then after that, they say she still hasn't shown a well-founded fear because her fear is not objectively reasonable. It's speculative. And a fear of crime doesn't meet the burden of proof for asylum. Then they also independently make a CAT determination. And I understand the concern about saying that there was no testimony about the family members. The government is willing to admit that. But the board doesn't rely on that in denying her CAT application. The board says she's never been tortured in Guatemala. And I think she would – I don't think she contends that she was ever tortured. That's part of the CAT determination. And also, she hasn't showed that the government would consent or acquiesce to her torture by this neighbor. And I don't think there's anything in the record that would dispel that. That's supported by the record. So I think, yes, the immigration judge did make errors in her decision. But the board, when presented with those errors, was able to correct them and say even based on that, we still believe that the denial of the applications was correct. Your Honor, I just would also like to address Mr. Hoppeck's argument about administrative exhaustion. That was filed in the second brief in this case. The administrative exhaustion requirement is mandatory. It's part of the Immigration and Nationality Act. It's jurisdictional. This policy that he cites, too, it's not a policy. It was just an opinion by the then chairman of the board. The board has very clear policies and procedures that are defined in the statute and regulation and in the board's practice manual about what you must do if you have a final order of removal. And simplifying a supplemental brief is not one of them. Your Honors, if there are no further questions, we're prepared to rest. Seeing none, thank you for your argument. Thank you. Mr. Hoppeck. Sure. Thank you. I wanted to pick back up on exhaustion. I think it's important to note, we think he did, appellate counsel didn't write a long brief, but it is exhausted. At page 31 of the administrative record, appellate counsel argued that she hadn't gotten a fair hearing. Exhaustion, the doctrine of exhaustion is about putting the agency on notice of what the issues are,  I agree it should have been longer, but I think the brief to the board exhausted the issues. A good sign of that is that the board addressed the due process issue. Clearly the board knew that due process was a claim he was making. And then finally, I understand the department's argument about this not being a formal policy, the 2009 policy we talk about in our second brief, but the board's decision doesn't mention it. The second board decision on review merely says this is a motion to reconsider. These arguments all were either previously raised or could be raised, could have been raised. So we deny it, decline to reconsider. If the court were to entertain the attorney general's arguments that this isn't a real policy, it's not an effect, what the court would need to do is remand to the board to say that because the Chenery Doctrine says the agency has to say that first, and then the court reviews it. The court can't make that determination in the first instance. The final thing I wanted to say is the notion that she could have perfected her claim at the board is in error. I disagree because, as the department argues in its second merits brief, you can't raise new things at the board. The board is not a fact-finding body. And so as we try to file our supplemental brief at the board, the attorney general says you can't do that, can't file new things at the board. I think the notion that this pro se respondent could have done that, could have filed a new asylum claim at the board, I'm not aware of any authority for it. Thank you, Mr. Hoppe. Thank you. Cases 17-1414 and 17-2662 are submitted for decision.